**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES SHEPARD, | ) | CASE NO. 1:12-CV-1307 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, James Shepard ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying his application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

**I. PROCEDURAL HISTORY**

On February 22, 2008, Plaintiff filed his application for POD and DIB, alleging a disability onset date of March 13, 2003, which he later amended to April 8, 2003. (Transcript ("Tr.") 13, 27-26.) The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*) On September 23, 2010, an ALJ held Plaintiff's hearing. (*Id.*) Plaintiff participated in the hearing, was represented by counsel, and testified. (*Id.*) A

vocational expert ("VE") also participated and testified. (*Id*) On November 4, 2010, the ALJ found Plaintiff not disabled. (Tr. 19.) On April 11, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On May 24, 2012, 2012, Plaintiff filed his complaint to challenge the Commissioner's final decision. (Doc. No. 1.) On October 12, 2012, Plaintiff filed his Brief on the Merits. (Doc. No. 13.) On November 20, 2012, the Commissioner filed his Brief on the Merits. (Doc. No. 14.) Plaintiff did not file a Reply Brief.

Plaintiff asserts that the ALJ's decision is not supported by substantial evidence because the ALJ failed to: (1) account for Plaintiff's limited ability to reach overhead with his left arm and his moderate limitations in concentration, persistence and pace in formulating Plaintiff's residual functional capacity ("RFC"); and (2) provide sufficient explanation for finding Plaintiff not credible. The Commissioner argues that, to the extent that ALJ erred, any error is harmless, and that the ALJ's conclusions are supported by substantial evidence in the record.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born on April 8, 1953, and was 54 years old when he filed his POD and DIB application. (Tr. 126.) He completed high school, and attended electronics training classes for one and one-half years. (Tr. 30.) Plaintiff had past relevant work as a tool grinder and a service grinder. (Tr. 30-31.)

    **B.**    **Medical Evidence**[1]

    **1.**    **Treating Providers**

On November 12, 2003, Plaintiff underwent an electromyographic examination ("EMG") of his left shoulder, which revealed no evidence of cervical motor radiculopathy. (Tr. 267.) On January 1, 2004, neurologist Kerry H. Levin, M.D., examined Plaintiff, noting Plaintiff's report that he began experiencing pain in his left shoulder in early March 2003. (Tr. 264.) Plaintiff complained of a "tightness and aching pain" in his shoulder, which gradually grew severe enough that it prevented him from working as a tool grinder. (*Id.*) Plaintiff described a "restlessness in his shoulder muscles and the need to move his arm to 'stretch' it." (*Id.*) Dr. Levin noted that Plaintiff had previously tried prescription pain medications and physical therapy, which did not alleviate the pain. (*Id.*)

Dr. Levin's examination revealed a restricted range of motion, active and passive, in Plaintiff's left shoulder, noting that Plaintiff could raise his left arm to just above 90 degrees at the shoulder. (Tr. 265.) Dr. Levin noted that Plaintiff had a normal neurological exam, with the exception of a "voluntary vs. involuntary muscle activation around the shoulder joint suggesting dyskinesia or dystonia." (Tr. 266.) He opined that Plaintiff had musculoskeletal pain syndrome, with no evidence of peripheral nervous

---

[1] The ALJ determined that Plaintiff had multiple severe physical impairments, in addition to the mental impairment of adjustment disorder with depressed mood. (Tr. 15.) Plaintiff's arguments concern the ALJ's conclusions regarding the condition of Plaintiff's left shoulder and the limitations arising out of his mental impairment. (Plaintiff's Brief ("Pl. Br.") at 8-13.) Accordingly, this Memorandum Order and Opinion discusses only the medical evidence relevant to those conditions.

system injury.  (*Id*.)  Dr. Levin recommended that Plaintiff undergo steroid injections and obtain further orthopedic review of his test results.  (*Id*.)

On January 28, 2004, Michael Moore, M.D., examined Plaintiff in connection with a worker's compensation claim.  (Tr. 359.)  He noted Plaintiff's complaints of pain when he slept on his left side, flexed or abducted his shoulder, or externally rotated his shoulder in an abducted position.  (*Id*.)  Dr. Moore observed that Plaintiff experienced pain with external rotation versus resistance, and that his range of motion was limited to 90 degrees for both flexion and abduction.  (*Id*.)  He diagnosed Plaintiff with trigger point and infraspinatus tendinosis.  (*Id*.)  Dr. Moore administered a steroid injection, after which Plaintiff's range of motion increased to 160 degrees for flexion and 170 degrees for abduction.  (*Id*.)  Dr. Moore recommended that Plaintiff follow up in one month.  (*Id*.)

On February 13, 2004, Frederick Wilson, D.O., examined Plaintiff and noted Plaintiff's complaints that his shoulder pain had returned and increased after the steroid injection. (Tr. 356-57.)  Dr. Wilson intended to follow up with Drs. Levin and Moore regarding further treatment options.  (Tr. 357.)  In May 2004, Plaintiff continued to complain of constant pain in his left shoulder, which was alleviated somewhat by treatment from a chiropractor.  (Tr. 354.)  Dr. Wilson recommended that Plaintiff use a TENS machine and undergo physical therapy.  (*Id*.)  In June 2004, Plaintiff reported that the therapy and the TENS machine had reduced his shoulder pain and that he was continuing to receive chiropractic treatment.  (Tr. 351.)  In September 2004, Plaintiff continued to complain of left shoulder pain, which he rated at a 3 out of 10.  (Tr. 347.)

4

An October 21, 2004 MRI of Plaintiff's left shoulder revealed mild undersurface fraying/partial thickness tear in the distal infraspinatus tendon, and no full thickness rotator cuff tear.  (Tr. 269.)  On October 26, 2004, Dr. Wilson noted Plaintiff's report that his left shoulder pain reached 7 out of 10 at night and occasionally woke him.  (Tr. 354.)  He recommended that Plaintiff continue with the exercises he learned in physical therapy.  (*Id*.)  In December 2004, Dr. Wilson opined that Plaintiff had reached maximum medical improvement, and would require vocational rehabilitation.  (Tr. 343.)  Plaintiff reported that he required a vicodin to fall asleep at night because of the shoulder pain.  (*Id*.)

On March 28, 2005, Suzana Sarac Leonard, M.D., examined Plaintiff, noting his complaints of constant pain and inability to perform daily tasks.  (Tr. 338-39.)  She diagnosed him with a rotator cuff tear, prescribed Vicodin, and recommended her undergo acupuncture and electrical stimulation.  (Tr. 339.)

On June 22, 2005, Sami Moufawad, M.D., examined Plaintiff, noting his complaints of neck pain radiating into his left shoulder.  (Tr. 262.)  Dr. Moufaward recommended that Plaintiff undergo acupuncture for his neck and shoulder pain.  (Tr. 262.)  Plaintiff received treatment with acupuncture and a TENS unit.  (*Id*.)  On June 30, 2005, Plaintiff underwent a second round of acupuncture, and treatment with a TENS module.  (Tr. 260.)  He reported that his pain had "returned to baseline."  (*Id*.)  On July 7, 2005, Plaintiff reported that his relief from the acupuncture treatments was short lived and that he had not noticed any improvement in his condition.  (Tr. 258.)  Dr. Moufawad advised Plaintiff that it generally requires six rounds of acupuncture to experience any improvement, and instructed him to continue with the treatment.  (*Id*.)  On July 14,

2005, Plaintiff reported that, several days before, he had been very dizzy and had to stay in bed for two days. (Tr. 255.) Examination revealed tightness around Plaintiff's left shoulder. (*Id.*) Dr. Moufawad diagnosed Plaintiff with rotator cuff syndrome. (*Id.*) He recommended that Plaintiff hold off on continuing the acupuncture, and instructed him to use the TENS unit and a Lidoderm patch. (*Id.*)

On July 25, 2005, Dr. Leonard noted Plaintiff's complaint of incapacitating pain in his left shoulder. (Tr. 327.) She indicated that she would refer Plaintiff to an orthopedic specialist. (*Id.*) During an April 2006 routine medical examination, Dr. Leonard noted that Plaintiff was scheduled for rotator repair surgery on his left shoulder. (Tr. 321.)[2]

In August 2006, Plaintiff began physical therapy at NovaCare Rehabilitation ("NovaCare"). (Tr. 384-432.) He underwent 67 sessions of physical therapy, which ended after the state worker's compensation program declined to continue paying for them. (Tr. 384.)

On October 18, 2006, Kiva Shtull, M.D., examined Plaintiff at the request of the state worker's compensation agency. (Tr. 611-15.) Plaintiff reported to Dr. Shtull that he injured his left shoulder as a "result of 'repetitive motion' using a surface grinder." (Tr. 611.) Plaintiff reported that his shoulder was "'doing pretty good,'" experienced a "'a little pain at night,'" and that his range of motion was improved after an April 21, 2006 surgery. (Tr. 613.) He was not taking any medications for his shoulder. (Tr. 615.) Dr. Shtull opined the Plaintiff was capable of full-time employment with the following restrictions: no lifting, carrying, pulling, pushing or manipulating any bulky objects or

---

[2] The administrative transcript does not contain any records of Plaintiff's surgery.

6

objects heavier than 20 pounds; no exposure of his left extremity to vibratory forces; no climbing ladders or scaffolds; no repetitive or fast-paced motion involving the left shoulder; and no work above the chest level. (*Id*.)

On January 27, 2007, Michael R. Magoline, M.D., completed a medical source statement.[3] (Tr. 380-81.) He opined that Plaintiff's ability to lift/carry was affected by his "l[eft] shoulder rotator cuff tear," and that Plaintiff could rarely reach and push/pull; could occasionally handle, feel and engage in gross and fine manipulation. (*Id*.) Dr. Magoline noted that Plaintiff experienced moderate and, occasionally, severe pain. (Tr. 381.)

In August 2007, Timothy C. Shanor, MSPT, completed a Physical Work Performance Evaluation. (Tr. 413-17.) Mr. Shanor opined that Plaintiff was capable of working at the medium level of exertion, with the following limitations: Plaintiff could occasionally lift 55 pounds from the floor to his waist, two-hand carry 55 pounds, lift 35 pounds from waist to eye level, push and pull 50 pounds, work standing with his arms over his head, work standing or stooping, and reach forward; could frequently climb stairs, squat, and repeatedly rotate his trunk; and could constantly sit, stand, work while sitting or crouching and walk. (Tr. 416.) His balance on level surfaces was adequate. (*Id*.) In September 2007, NovaCare staff noted that Plaintiff had unspecified functional

---

[3] In a November 2007 letter, Dr. Magoline stated that he had been treating Plaintiff for "over a year with regards to his left shoulder." (Tr. 617.) However, the administrative transcript does not contain any records from Dr. Magoline predating the January 2007 statement.

7

limitations in lifting, pushing, pulling and reaching overhead.  (Tr.384.)[4]

In a November 27, 2007 letter requesting increased worker's compensation benefits for Plaintiff, Dr. Magoline reported that Plaintiff had "significant discomfort in his left shoulder" when Dr. Magoline began treating him, and that Plaintiff had an MRI "consistent with a rotator cuff problem."  (Tr. 617.)  He stated that, in April 2006, Plaintiff had undergone arthroscopic surgery on his left shoulder, and had thereafter undergone intensive physical therapy to rehabilitate the shoulder.  (*Id.*)  Dr. Magoline opined that Plaintiff required further physical therapy to "maximize his strength in his neck and left arm," noting that Plaintiff continued to experience "significant discomfort even with simple activities of daily living."  (*Id.*)

On March 4, 2008, Dr. Magoline noted that Plaintiff was "still having pain up into his neck," and that he would re-examine Plaintiff in six to eight weeks.  (Tr. 458.)  On July 22, 2008, Dr. Magoline noted that "there is really nothing new with regards to [Plainitff's] shoulder," and that Plaintiff exhibited positive Spurling's test with rotation of his neck to the left hand side, along with some mild weakness.  (Tr. 457.)  On October 28, 2008, Plaintiff reported to Dr. Magoline that "overall the left shoulder is doing fairly well."  (Tr. 576.)  Dr. Magoline noted that Plaintiff was involved in an ongoing dispute with the state worker's compensation program regarding injuries to his neck.  (*Id.*)

In an August 9, 2010 medical source statement, Dr. Magoline assigned Plaintiff the following restrictions: occasionally lifting 10 pounds; frequently lifting 5 pounds; rarely or never climbing, reaching, handling, pushing and pulling; occasionally feeling

---

[4] The September 2007 discharge report from NovaCare notes that Plaintiff underwent surgery on April 21, 2006.  (Tr. 384.)

and engaging in fine and gross manipulation. (Tr. 600-01.) He attributed Plaintiff's restrictions to pain in his left shoulder. (*Id*.) He noted that Plaintiff experienced mild and severe pain. (Tr. 601.) On August 10, 2010, Dr. Leonard completed a medical source statement, assigning Plaintiff similar limitations. (Tr. 584-85.)

### 2. Agency Assessments

On June 9, 2008, agency consultant Esberdardo Villanueva, M.D., opined that Plaintiff should be limited to occasionally reaching overhead on his left. (Tr. 450.) On October 23, 2008, agency consultant Jeffrey Rindsberg, Psy.D., examined Plaintiff, noting Plaintiff's reports of frustration with the process of obtaining benefits, problems sleeping due to pain and anxiety, irritability, and decreased desire to socialize. (Tr. 554-57.) He diagnosed Plaintiff with chronic adjustment disorder with depressed mood, and assigned him a Global Assessment of Functioning ("GAF") score of 60. (Tr. 557.) Dr. Rindsberg assigned Plaintiff the following limitations: no impairment in the ability to understand and follow instructions; mild impairment in his ability to maintain attention and perform simple, repetitive tasks; and moderate impairment to his ability to relate to others, including supervisors, and to withstand the stress and pressures associated with day to day work activities. (Tr. 557.)

In an October 27, 2008, mental RFC assessment, Tonnie Hoyle, Psy. D., opined that Plaintiff was moderately limited in his ability to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond

appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 558-59.)  Dr. Toyle opined that Plaintiff would "do best in jobs that do not require much contact with others in an environment that is relatively static." (Tr. 560.)  In an October 27, 2008 psychiatric review technique, Dr. Toyle assigned Plaintiff mild restrictions in activities of daily living, and moderate restrictions in maintaining social functioning and maintaining concentration, persistence and pace. (Tr. 572.)

### C. Hearing Testimony

#### 1. Plaintiff's Hearing Testimony

At his September 23, 2010, administrative hearing, Plaintiff testified as follows:

He stopped working due to a rotator cuff tear in his left shoulder.  (Tr. 34-35.)  He felt that his shoulder was "slightly better" after the surgery.  (Tr. 35.)  He lived with his wife and mother-in-law, and assisted with the shopping, did the laundry and cooked meals.  (Tr. 36.)  During the summer, he grilled on the barbecue.  (Tr. 41.)  Plaintiff was rebuilding a home computer, altering it to become a home theater PC by digitizing his records and VHS tapes.  (Tr. 37, 40.)  He worked on that project every other day for approximately two hours at a time.  (Tr. 40.)  Although he could move his right arm without problems, he had "to watch" movement with his left arm, as that caused him pain.  (Tr. 38.)  The pain in his left shoulder made it difficult to sleep at night.  (Tr. 36-37.)

#### 2. Vocational Expert's Hearing Testimony

The ALJ described the following hypothetical individual to the VE:

> [A]ge is 50 with a twelfth grade education; partially completed electronics training and more extensive machinist training.  And with the same past work as [Plaintiff.] Exertional ability is medium. . . . [S]hould not climb ladders or scaffold[s].  With the non-dominant left arm, can reach overhead occasionally. . . . [T]he individual will function best in a relatively solitary situation . . . [S]hould avoid situations that involve intense interpersonal interactions.  Also functions best in a relatively stable or static environment and should avoid routines that involve fast paced changes or frequent changes.

(Tr. 43.)  The VE opined that the hypothetical individual could perform Plaintiff's past relevant work at the semi-skilled level, as Plaintiff had once performed it.  (Tr. 43-44.)

### III.   STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that

11

"significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  Plaintiff last met the insured status requirements of the Act on December 31, 2008.

2.  Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of March 13,2 003 through his date last insured of December 31, 2008.

3.  Through the date last insured, Plaintiff had the following severe impairments: C4-5, C5-6, C6-7 disc/osteophyte complex; degenerative arthritis with left side foraminal narrowing; left shoulder infraspinatus tendinosis; adjustment disorder with depressed mood.

4.  Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, Plaintiff had the RFC to perform

>      medium work as defined in 20 C.F.R. § 404.1567(c) except he must never climb on ladders, ropes or scaffolds; he can do overhead reaching with the non-dominant left hand/arm; and he has moderate limitations on his ability to interact with the public, coworkers and supervisors (is best in a relatively solitary situation and should avoid intense interpersonal environment); and moderate limitations on his ability to adapt to stresses and changes (is best in relatively static environment with no fast-paced or frequent changes in routine).
>
> 6.   Through the date last insured, Plaintiff was capable of performing past relevant work as a tool grinder. This work did not require the performance of work-related activities precluded by Plaintiff's RFC.
>
> 7.   Plaintiff was not under a disability, as defined in the Act, at any time from March 13, 2003, the alleged onset date, through December 31, 2008, the date last insured.

(Tr. 15-19.) The ALJ concluded that Plaintiff had moderate difficulties in concentration, persistence and pace. (Tr. 16.)

## V.   LAW & ANALYSIS

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

13

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Assignments of Error

Plaintiff argues that the ALJ's determination of Plaintiff's RFC is not supported by substantial evidence in the record.  Plaintiff also contends that the ALJ's analysis of his credibility was incomplete.  The Commissioner responds that any error by the ALJ in formulating Plaintiff's RFC was harmless, and that substantial evidence supports the ALJ's RFC and credibility determinations.  Plaintiff's arguments are not well taken.

#### 1. The ALJ's Determination of Plaintiff's RFC

Plaintiff contends that the ALJ erred in formulating his RFC because the ALJ failed to include restrictions addressing Plaintiff's limited ability to reach overhead with his left arm, despite medical evidence in the record supporting such a restriction.  The Commissioner argues that, even if the ALJ erred in omitting any such restriction, the error is harmless because, in his hypothetical to the VE at Plaintiff's administrative hearing, the ALJ restricted overhead reaching with the left arm.

Plaintiff correctly notes that, in his decision, the ALJ did not include any limitation

14

on Plaintiff's ability to reach overhead with his left arm.  (Tr. 17 ("[H]e can do overhead reaching with the non-dominant left hand/arm.").)  However, in the hypothetical the ALJ gave to the VE at Plaintiff's administrative hearing, the ALJ limited overhead reaching with the left arm to "occasionally."  (Tr. 43 ("With the non-dominant left arm, can reach overhead occasionally. . . ").)  The ALJ did not offer any other hypotheticals to the VE. Thus, the VE accounted for the left side overhead reaching restriction when he opined that the hypothetical individual could perform Plaintiff's past relevant work.  And the ALJ based his conclusion that Plaintiff was not disabled on the VE's opinion.  (Tr. 19.) Although the ALJ may have erred in failing to include the restriction explicitly in the RFC of his written decision, Plaintiff does not explain how the outcome of his case would be different had the ALJ done so.  Given that the ALJ relied on an opinion from the VE that included the restriction, any error by the ALJ in omitting the restriction from his written decision is harmless, and does not require remand.  See *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.') (quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766, n.6 (1969)).

      Plaintiff further asserts that the ALJ erred in failing to include limitations in the RFC accounting for Plaintiff's moderate difficulties in concentration, persistence and pace. With respect to Plaintiff's mental limitations, the ALJ found as follows:

> [H]e has moderate limitations on his ability to interact with the
> public, coworkers and supervisors (is best in a relatively solitary
> situation and should avoid intense interpersonal environment); and
> moderate limitations on his ability to adapt to stresses and changes
> (is best in a relatively static environment with no fast-paced or

15

frequent changes in routine).

(Tr. 17.)  According to Plaintiff, although the ALJ imposed a moderate restriction on Plaintiff's ability to adapt to stress and changes, the ALJ failed to account for his difficulties with concentration and pace.  This argument, however, overlooks the restrictions the ALJ imposed in addition to limiting Plaintiff's ability to adapt to stress and changes in the workplace – a relatively static environment without fast-paced or frequent changes in routine.  Plaintiff does not explain how these additional restrictions are inadequate to address his moderate difficulties with concentration, persistence and pace.

Further, Plaintiff relies on two cases that are inapposite.  In *Cheeks v. Comm'r of Soc. Sec.*, 690 F. Supp. 2d 592 (E.D. Mich. 2009), the ALJ found that the claimant had moderate difficulties in concentration, persistence and pace, but ultimately restricted her only to simple, routine tasks in a low stress environment.  The district court determined that these restrictions were not sufficient to address the claimant's limitations because they "failed to adequately encompass [the claimant's] moderate pacing difficulties."  690 F. Supp. 2d at 602.  In *Allen v. Comm'r of Soc. Sec.*, No. 09-13503, 2010 WL 3905983 (E.D. Mich. June 2, 2010), *5, despite finding that the claimant had moderate difficulties in concentration, persistence and pace, the ALJ "made no reference whatsoever to concentrational limitations in the hypothetical question."  Unlike the ALJs in those cases, in this case, the ALJ included limitations that addressed Plaintiff's limitations in concentration, persistence and pace, as he restricted Plaintiff to a "relatively static environment with no fast-paced or frequent changes in routines." (Tr. 17.)  Accordingly, substantial evidence supports the ALJ's conclusion

16

regarding Plaintiff's mental limitations, and this argument lacks merit.

### 2. The ALJ's Assessment of Plaintiff's Credibility

Plaintiff contends that the ALJ erred in analyzing his credibility because he failed to specify his reasons for finding Plaintiff not credible.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, the ALJ's credibility determinations must be reasonable and based on evidence from the record.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).  Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight."  *Id.*

In challenging the ALJ's analysis of his credibility, Plaintiff points to a single sentence in the ALJ's written decision:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, duration and

17

limiting effects of these symptoms are not entirely credible.

(Tr. 19.) (emphasis omitted) Plaintiff asserts that this sentence is not sufficient to explain the ALJ's conclusion that he was not credible. This sentence, however, is not the only discussion of Plaintiff's credibility by the ALJ. Rather, in discussing Plaintiff's credibility throughout the written decision, the ALJ pointed to multiple types of evidence that undermined Plaintiff's allegations regarding the severity of his conditions, including medical records regarding his injuries (Tr. 17-18), the opinion of his physical therapist (Tr. 18 ("[T]he notes from this exam are detailed and extensive and tend to show [Plaintiff's] actual physical capabilities are inconsistent with those he alleges.")), Plaintiff's testimony about his activities (*Id*. (pointing to Plaintiff's testimony regarding his home theater PC project, and noting that it "requires reaching, fingering, grasping, handling, bending, etc.")), and Plaintiff's failure to seek treatment for his psychological problems (*Id*. ("He had a BWC case from 2003 through 2007 and no psychological conditions were ever addressed. If [Plaintiff] felt that his mental impairment was as debilitating as alleged, he would likely have sought treatment for his condition.")). Accordingly, the ALJ sufficiently explained the basis for his credibility determination, which is supported by substantial evidence in the record.

### VI. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED. **IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: December 28, 2012